UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION

|  |  |  |
|---|---|---|
| DENORA DIEHL on behalf of herself and all others similarly situated, | ) ) ) | 3:18cv122 |
|  | ) | Civil Action No. 3:05-MC-2025 |
| Plaintiff, | ) ) |  |
|  | ) | Removed from the Court of |
| v. | ) ) | Common Pleas of Bedford County, Pennsylvania |
| CSX TRANSPORTATION, INC., | ) |  |
|  | ) |  |
| Defendant. | ) ) |  |

## NOTICE OF REMOVAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Please take notice that defendant CSX Transportation, Inc. ("CSXT") hereby removes this action to federal court pursuant to 28 U.S.C. §§ 1441 and 1446 with full reservation of any and all defenses and objections.

In support of this notice, CSXT respectfully submits as follows:

1.     On May 22, 2018, plaintiff Denora Diehl filed a Complaint against CSXT in the Court of Common Pleas of Bedford County, Pennsylvania, Docket No. 2018-519 (the "State Court Action") on behalf of herself and all others similarly situated.

2.     Plaintiff served the summons and complaint upon CSXT on May 30, 2018.

3.     Removal is timely pursuant to 28 U.S.C. § 1446(b), in that this Notice of Removal is being filed within thirty (30) days of service of the Complaint. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

4.     In accordance with 28 U.S.C. § 1446(a), copies of all pleadings and orders filed in the State Court Action are attached as Exhibit 1.

5.     The Court of Common Pleas of Bedford County, Pennsylvania is located within the district of the United States District Court for the Western District of Pennsylvania.

6.     As shown below, this Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), in that the action is a putative class action of at least one hundred proposed class members, the parties are of at least minimally diverse citizenship, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

7.     By removing the action to this Court, CSXT does not admit any of the facts alleged in the Complaint, or waive any defenses, objections, or motions available to it under state or federal law.  CSXT expressly reserves the right to challenge the adequacy of the allegations in the Complaint.  *See Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005) ("That the plaintiff may fail in its proof, and the judgment be less than the threshold (indeed, a good chance that the plaintiff will fail and the judgment will be zero) does not prevent removal.)."

8.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice is being served on plaintiff, and filed with the court administrator for this Court and with the court in which the State Court Action was filed.

## THE COURT HAS JURISDICTION UNDER THE
## CLASS ACTION FAIRNESS ACT OF 2005

9.     This action arises from the August 2, 2017 derailment of a CSXT train in or around Hyndman, Bedford County, Pennsylvania.  *See* Compl. ¶¶ 11-12, 19-20.

10.    Removal of this action is authorized under the Class Action Fairness Act of 2005 ("CAFA").  28 U.S.C. §§ 1332(d) and 1453.

11.     Under CAFA, a federal court has jurisdiction over a putative class action where the proposed class is greater than one hundred persons, there is minimal diversity between the parties, and the amount in controversy exceeds an aggregate amount of $5 million, exclusive of interest and costs.  28 U.S.C. § 1332(d).

**The Proposed Class Is Greater Than 100 Persons**

12.     Plaintiff brings this action as a putative class action.  The Complaint defines the proposed class as "individuals who were mandatorily evacuated from their homes because of the CSX derailment," Compl. ¶ 30, and states that "the class consists of approximately one thousand residents of Hyndman." *Id.* ¶ 33(a).  Accordingly, CAFA's minimum class size requirement is satisfied.

**The Parties Are Completely Diverse**

13.     There is complete diversity between CSXT and plaintiff.

14.     According to the Complaint, plaintiff is a resident of Bedford County, Pennsylvania. *Id.* ¶¶ 33(a).  The members of the putative class are all residents of Bedford County, Pennsylvania. *Id.* ¶¶ 33(a).

15.     The sole defendant is CSXT. *Id.* ¶ 2.  As plaintiff admits, CSXT is a Virginia corporation with its principal place of business in the State of Florida. *Id.*  As such, for purposes of diversity jurisdiction, CSXT is a citizen and resident of the states of Virginia and Florida.

16.     Accordingly, there is diversity between CSXT and members of the putative class. *See* 28 U.S.C. § 1332(d)(2)(A) (the diversity requirement of CAFA is satisfied when "any member of a class of plaintiffs is a citizen of a State different from any defendant").

**The Amount In Controversy Requirement Is Met**

17.    Plaintiff seeks to recover, on behalf of herself and approximately one thousand putative class members, compensatory damages and punitive damages.  Under CAFA, this Court considers whether the value of these claims as to all putative class members in the aggregate exceeds $5 million.  *See* 28 U.S.C. § 1332(d)(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs.").

18.    "[T]he general federal rule has long been to decide what the amount in controversy is from the complaint itself."  *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961); *Angus v. Shiley Inc.*, 989 F.2d 142, 145 (3rd Cir. 1993).  The Court engages in amount-in-controversy analysis with an eye toward reaching a reasonable reading of the value of the rights being litigated.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977).  "In cases with demands of indeterminate value, 'the amount in controversy is not measured by the low end of an open-ended claim, but rather by reasonable reading of the value of the rights being litigated.'"  *Judge v. Philadelphia Premium Outlets*, No. CIV.A 10-1553, 2010 WL 2376122, at *3 (E.D. Pa. June 8, 2010) (quoting *Angus*, 989 F.2d at 146).

19.    Here, the complaint does not specify an amount of damages sought.  In such settings, the removing defendant's burden is to show that the amount in controversy more likely than not exceeds the jurisdictional requirement.  *Brewer v. Geico*, No. CIV.A. 13-1809, 2014 WL 241756, at *2 (W.D. Pa. Jan. 22, 2014) (recognizing the preponderance of the evidence standard for removal); *see also Grace v. T.G.I. Fridays, Inc.*, No. CIV. 14-7233 RBK, 2015 WL 4523639, at *6 (D.N.J. July 27, 2015) (the preponderance of evidence standard is the same in cases removed under CAFA); *see also Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9

4

(1997) ("The burden of showing something by a preponderance of the evidence ... simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."). "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required . . . only when the plaintiff contests, or the court questions, the defendant's allegation." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014).

20.     In making this calculation, courts may consider jury awards in comparable cases as evidence of the value of the injuries alleged. *See, e.g.*, *Brown v. Jackson Hewitt, Inc.*, No. 1:06-cv-2632, 2007 U.S. Dist. LEXIS 13328, at *17 (N.D. Ohio Feb. 26, 2007) (including "similar verdicts" among evidence defendant could rely upon to demonstrate amount in controversy); *Varga v. Heartland Hospice Servs.*, No. 05-10118, 2007 U.S. Dist. LEXIS 67814, at *20-26 (E.D. Mich. Aug. 27, 2007) (noting that relevant facts in determining amount in controversy "include specific information about the plaintiff's injury... and the size of judgment received by other plaintiffs with similar claims").

21.     Given a putative class of approximately one thousand persons as alleged in the complaint, the amount in controversy requirement is satisfied if the putative value of each class member's claim exceeds $5,000.00.

22.     Here, plaintiff seeks punitive damages, premised on allegations that CSXT's conduct was "intentional, willful, wanton, negligent, careless, outrageous, and/or reckless." Compl. ¶ 49. Plaintiff's request for punitive damages could alone be conclusive evidence that this case satisfies the amount in controversy. Under Third Circuit precedent, "[a] request for

punitive damages will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum." *Golden ex rel. Golden v. Golden*, 382 F.3d 348, 355 (3d Cir. 2004) *abrogated on other grounds in Three Keys Ltd. V. SR Utility Holding Co*, 540 F.3d 220, 227 (3rd Cir. 2008); *see also Bell v. Preferred Life Assurance Society*, 320 U.S. 238, 240 (1948) (both actual and punitive damages are included in calculating the amount in controversy).  While CSXT does not believe punitive damages are appropriate in this case, there is no statutory cap on punitive damages in Pennsylvania.

23.     The amount in controversy is even more clearly met when the prayer for punitive damages is coupled with the balance of the Complaint's allegations.  Plaintiff pleads two causes of action.  The first asserts that CSXT was negligent.  Plaintiff seeks actual damages and punitive damages on behalf of herself and the putative class for "being evacuated from their property, deprived quiet enjoyment of their property, having property rights invaded, losing the use and enjoyment of their property, and being forcibly subjected to undue aggravation and inconvenience" allegedly resulting from the August 2, 2017 derailment of a CSXT train.  *See* Compl. ¶ 49.  Plaintiff asserts that the "forced evacuation" lasted "from 2 days to multiple weeks." *Id.* ¶ 7.  Plaintiff, whose claims are allegedly representative of the proposed class, *id.* ¶ 33(c), was evacuated for 18 days, and was allegedly inconvenienced and forced to incur various expenses as a result.  *Id.* ¶¶ 20-28.

24.     Plaintiff asserts in her second cause of action that CSXT created a private nuisance to plaintiff and the proposed class "in the form of the loss of use and enjoyment of their property, aggravation and inconvenience, fear, anxiety, and mental anguish." *Id.* ¶ 55.  Plaintiff further asserts that CSXT's conduct "endangered their life and health" and "gave offense to the

senses."  Plaintiff alleges that the subsequent nuisance she suffered, which consisted of intrusive

lighting, *id.* ¶ 24, extreme and excessive noise, *id.* ¶ 25, and noxious fumes, smoke, and odors,

*id.* ¶ 26, lasted for approximately three months.  *Id.* ¶ 24.

25.    Although CSXT disputes in all respects plaintiff's allegations of liability and

injury, courts have awarded judgments in excess of $5,000 for facially similar cases involving

train derailments and/or evacuations.  *See, e.g.*, *Adams v. CSX Railroads*, 902 So.2d 413, 416

(La. App. 4th Cir. 2005) (jury award to one plaintiff of "$60,000.00 for physical pain and

suffering, $25,000.00 for mental anguish, and $15,000.00 for evacuation/ inconvenience");

*Freeman v. Norfolk S. Corp.*, No. 3:03cv00341, 2007 WL 4180728 (E.D. Tenn. 2007) (awarding

the individual plaintiff $500 per day for inconvenience and $400 for expenses following a three-

day mandatory evacuation).  Even by using the more conservative of these comparable claims,

*Freeman*'s $500 per day, 2007 WL 4180728, at *1, plaintiff would claim $9,000 for the eighteen

days she was evacuated, even before accounting for her other damages claims.  Thus, plaintiff, a

purportedly typical member of the class, has alleged damages well in excess of $5,000 regarding

her evacuation claims alone.

26.    Alternatively, plaintiff's nuisance claim based on CSXT's three-month repair of

the derailment site independently satisfies the amount in controversy.  Plaintiff alleges that she

suffered from bright lights, loud noises, and noxious fumes, smoke, and odors "at all hours of the

day and night" for three months.  Compl. ¶¶ 24-26.  In 2010, a California court awarded $5,000

per month to plaintiffs who had to endure "constant, unreasonable, and extreme construction

noise and vibrations."  *Telford v. Lass*, 36 Trials Digest 13th 31, 2010 WL 3422932 (Cal. Super.

2010).

27.     These calculations do not yet take into account plaintiff's claim for punitive damages, which, as noted, "generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum." *Golden*, 382 F.3d at 355.

28.     Considering that plaintiff has alleged her claims are typical of the proposed class, a reasonable and common-sense reading of the Complaint demonstrates that each of the one thousand class members' claims for negligence, nuisance, and punitive damages combined more likely than not exceeds $5,000 and the aggregate amount in controversy more likely than not exceeds $5,000,000.

**This Putative Class Action Is Properly Removed To This Court**

29.     Because there is minimal diversity of citizenship, the aggregate amount in controversy exceeds $5,000,000, and the putative class is greater than one hundred persons, this Court has original subject matter jurisdiction over this putative class action.

30.     Because subject matter jurisdiction exists under 28 U.S.C. § 1332(d), this action is removable pursuant to 28 U.S.C. § 1453.

**WHEREFORE**, defendant hereby respectfully gives notice that the State Court Action, formerly pending against it in the Court of Common Pleas of Bedford County, Pennsylvania, is removed to the United States District Court for the Western District of Pennsylvania.

June 8, 2018                                     Respectfully submitted,

                                                */s/ Jeffrey A. Jackson*
                                                Jeffrey A. Jackson, Esquire
                                                Pa. I.D. No. 56888
                                                T. H. Lyda, Esquire
                                                Burns White, LLC
                                                48 26th Street
                                                Pittsburgh, PA 15222

Scott L. Winkelman (*pro hac vice* admission pending)
April N. Ross (*pro hac vice* admission pending)
Carolyn W. Wagner (*pro hac vice* admission pending)
Eric A. Stahl (admission pending)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC, 20004
(202) 624-2500

*ATTORNEYS FOR CSX TRANSPORTATION, INC.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice of Removal has been

furnished to the following recipients by U.S. Mail, postage prepaid, this 8th day of June, 2018:

Troy M. Frederick, Esquire
57 South Sixth St., P.O. Box 1107
Indiana, PA 15701
(724) 349-5602


*/s/ Jeffrey A. Jackson*
Jeffrey A. Jackson, Esquire
Attorney for CSX Transportation, Inc.

# EXHIBIT 1

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

BEDFORD _____ County

| For Prothonotary Use Only: |
| --- |
| Docket No: **2018-519** |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: DENORA DIEHL | Lead Defendant's Name: CSX TRANSPORTATION, INC. |
| --- | --- |

| Are money damages requested? [x] Yes [ ] No | Dollar Amount Requested: (check one) [ ] within arbitration limits [x] outside arbitration limits |
| --- | --- |

| Is this a *Class Action Suit*? [x] Yes [ ] No | Is this an *MDJ Appeal*? [ ] Yes [x] No |
| --- | --- |

Name of Plaintiff/Appellant's Attorney: TROY M. FREDERICK, ESQUIRE

[ ] Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE*. If you are making more than one type of claim, check the one that you consider most important.

**SECTION B**

**TORT** *(do not include Mass Tort)*
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [x] Nuisance
- [ ] Premises Liability
- [ ] Product Liability *(does not include mass tort)*
- [ ] Slander/Libel/ Defamation
- [ ] Other: _____

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other: _____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
  _____
- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other
  _____
- [ ] Other: _____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other: _____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
  _____
- [ ] Zoning Board
- [ ] Other: _____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other: _____

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS
OF BEDFORD COUNTY PENNSYLVANIA

DENORA DIEHL, on behalf of
herself and all others similarly situated,

Plaintiff,

vs.

CSX TRANSPORTATION, INC.,

Defendant.

Docket No. 2018 - 519

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Filed on Behalf of Plaintiff By:

Marcus & Mack, P.C.,
Troy M. Frederick, Esquire
Identification No: 207461
Bryan S. Neiderhiser, Esquire
Identification No: 81496
57 South Sixth Street
Indiana, PA 15701
Telephone: (724) 349-5602
Fax: (724) 349-8362

ORIGINAL

IN THE COURT OF COMMON PLEAS
OF BEDFORD COUNTY PENNSYLVANIA

DENORA DIEHL, on behalf of
herself and all others similarly situated,

Plaintiff,

vs.

CSX TRANSPORTATION, INC.,

Defendant.

Docket No. 2018-519

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## <u>NOTICE TO DEFEND</u>

NOTICE: You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court complaint or for any other claim or relief requested by the plaintiffs. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER OR IF YOU CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP

Prothonotary
Bedford County Courthouse
200 S. Juliana Street
Bedford, PA 15522
Telephone Number: (814) 623-4833

By: _____

Troy M. Frederick, Esquire
MARCUS & MACK, P.C.
57 South Sixth Street
Indiana, PA 15701
Phone: (724) 349-5602
Fax: (724) 349-8362

1

IN THE COURT OF COMMON PLEAS
OF BEDFORD COUNTY PENNSYLVANIA

DENORA DIEHL, on behalf of
herself and all others similarly situated,

Plaintiff,

vs.

CSX TRANSPORTATION, INC.,

Defendant.

Docket No. 2018-519

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

**AND NOW**, comes Plaintiff Denora Diehl, who brings this action against Defendant CSX Transportation, Inc. (hereafter "Defendant" or "CSX") by and through her attorneys Troy M. Frederick, Esquire, Bryan S. Neiderhiser, Esquire and Marcus & Mack, P.C., individually and on behalf of all others similarly situated ("Class Members"), and respectfully avers as follows:

### PARTIES

1.     Plaintiff Denora Diehl is an adult individual who is a resident of Hyndman, Bedford County, Pennsylvania ("Hyndman") and who resides and owns property located in the mandatory evacuation zone resulting from the August 2, 2017 CSX Train Derailment ("Derailment") in Hyndman. Ms. Diehl has resided at said address for the past 27 years.

2.     Defendant CSX Transportation, Inc., is a foreign corporation organized under the laws of the State of Virginia with its principal place of business located in Jacksonville, Florida. At all times relevant to this action, CSX operated the train that derailed in Hyndman, Pennsylvania on August 2, 2017 and owned the tracks upon which the train was operated when it derailed.

2

**NATURE OF THE CASE**

3.      This is a class action brought on behalf of Plaintiff, and on behalf of a proposed class of other people similarly situated ("Proposed Class"), against CSX for private nuisance and negligence as a result of the catastrophic derailment of a train hauling toxic chemicals in Hyndman, Bedford County, Pennsylvania, on or about August 2, 2017.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this action and venue is proper because Defendant CSX regularly and continuously conducts business in Bedford County.   Venue is proper in this County as the acts upon which this action is based occurred and continue to occur in this County.   All members of the Class either reside or resided in this County at all times relevant to this action.

**FACTUAL ALLEGATIONS**

5.      On August 2, 2017, Defendant CSX was operating a train consisting of five locomotives, a total of 178 railcars, 128 loaded and 50 empty, carrying mixed freight (hereafter, "Train" or "Subject Train").

6.      It is believed and therefore averred that the Train was traveling from Chicago, Illinois to Selkirk, New York, on CSX's Keystone Subdivision which includes the infamous "Sand Patch Grade", which crosses the Allegheny Mountains, and is the steepest grade on that route.  The Sand Patch Grade precedes Hyndman. *See* Figure 1.

Figure 1:[1]

---

[1] Figure 1 was taken from a March 2018 Pennsylvania Department of Transportation Map, the entirety of which is attached hereto as Exhibit "1".



7.      The Derailment occurred in Hyndman, Pennsylvania on August 2, 2017 at approximately 4:54 a.m. and resulted in: a fire that blazed for over two days; at least one railcar destroying part of a house situated near the railroad tracks; and the mass evacuation of approximately 1,000 people from their homes from 2 days to multiple weeks.

8.      The derailed railcars included the 33rd through the 65th. Fifteen tank cars transporting hazardous materials were involved in the Derailment, including: three tank cars containing propane; eight tank cars containing molten sulfur; two tank cars containing asphalt; and two tank cars containing phosphoric acid residue.  A propane tank car and a molten sulfur tank car ruptured and caught fire, burning for more than two days. *See* Figures 2 & 3:

4

Figure 2:[2]



Figure 3:



---

[2] Figures 2 & 3 were taken from the National Transportation Safety Board's Preliminary Report addressing the August 2, 2017 Hyndman, PA CSX Train Derailment, attached hereto as Exhibit "2".

9.      Prior to the Derailment, two separate CSX crews were involved in the operation of the Train. The first crew stopped the Train on a descending grade after experiencing air brake problems. The first crew applied 58 hand brakes during the inspection and recharging of the air brake system. The Conductor of the first crew discovered an air leak in the brake system approximately 20 railcars from the rear of the Train. A CSX mechanical employee arrived at the train and attempted, unsuccessfully, to repair the air brake system and/or to otherwise ensure that the Train was in safe and proper operating condition. At some point during this repair/inspection, the first crew did not have sufficient duty time to complete the trip and CSX ordered a second crew to take over and finish the route in conscious, negligent, careless, willful, wanton, outrageous, and/or reckless disregard for the rights and safety of Plaintiff and the Proposed Class.

10.     The second crew knew or should have known that the problem with the air brake system on the Train had not been repaired and continued to operate the Train in negligent, careless, willful, wanton, outrageous and/or reckless disregard for the rights and safety of Plaintiff and the Proposed Class.

11.     Having been directed by CSX to continue the route, the second crew negligently, carelessly, willfully, wantonly, outrageously and/or recklessly continued to operate the Train toward Hyndman. Knowing that the Train was not safe to operate, the second crew first attempted to move the train with 58 hand brakes applied but was unable to pull the train down the grade. The Conductor of the second crew released the first 25 hand brakes, leaving 33 hand brakes applied. The second crew then negligently, carelessly, recklessly, willfully, and/or wantonly continued to pull the train down the grade with locomotive power while 33 hand brakes were applied, reaching speeds of 20 to 30 mph, when they knew or should have known

6

that it was not safe to do so, in reckless disregard for the rights and safety of Plaintiff and the Proposed Class.

12.    The Engineer of the second crew switched from locomotive power to dynamic braking three times before the Train derailed.

13.    The 35th railcar from the front of the Train derailed one set of wheels on a curve 1.7 miles before the location of the Derailment in Hyndman. The second crew then negligently, carelessly, recklessly, willfully, and/or wantonly continued to operate the Train while they knew or should have known that: it was unsafe to do so; that there was a problem with the braking system; and that at least one railcar had partially derailed in reckless disregard for the rights and safety of Plaintiff and the proposed class.

14.    After being dragged for almost two miles after derailing, the derailed railcar reached a highway-railroad grade crossing and moved further off the rail, initiating or contributing to the Derailment of the other railcars.

15.    The second crew, realizing that the Train was not safe to operate, applied the hand brakes so negligently, carelessly, willfully, wantonly and/or recklessly that several wheels east and west of the derailed railcars had bluing due to brake pad friction and heat and had worn flat spots in the wheels and built-up tread from the hand-brakes which prevented the wheels from rotating.

16.    The Train was not properly organized to safely and appropriately distribute the weight of the railcars, with the front 35 railcars weighing only 1,631 tons and the remaining 143 railcars, trailing the 35th, weighing 16,621 tons. The 35th railcar from the front of the train was an empty high-sided gondola within a block of 27 empty railcars. This dangerous configuration contributed to the Derailment. This improper railcar arrangement was negligent, careless,

willful, wanton and/or reckless and was done in reckless disregard for the rights and safety of Plaintiff and the Proposed Class.

17.    The first and second crews and the CSX mechanical employee were working, at all times relevant to this action, within the course and scope of their employment with CSX and to further the interests of CSX.

18.    It is believed and therefor averred that CSX had directed and/or permitted the afore discussed negligent, careless, outrageous, willful, wanton and/or reckless conduct of its crews in conscious disregard for the rights and safety of Plaintiff and the Proposed Class.

19.    Defendant's negligent, willful, wanton, outrageous, and/or reckless conduct as set forth herein caused an invasion in Ms. Diehl's and the Proposed Class' interest in their private use and enjoyment of their property, being mandatorily evacuated from their homes from two days to multiple weeks, and this invasion was intentional, unreasonable, negligent, and/or reckless.  CSX's invasion caused significant harm to Ms. Diehl and the proposed class, as discussed throughout this complaint the same being incorporated here as though set forth in its entirety, and this significant harm is the kind of harm that was suffered by normal people in Hyndman and by property in normal condition being used for normal purposed in Hyndman.

## PLAINTIFF'S ALLEGATIONS

20.    On August 2, 2017, Ms. Diehl, and the three other individuals who lived in her house, evacuated her home at 5:00 a.m., immediately following the Derailment. Ms. Diehl and everyone who lived in her house were mandatorily evacuated from her house as a result of the Derailment from approximately August 2nd to August 20th, 2017.

21.    After she initially evacuated her house, Ms. Diehl, along with the rest of the evacuated residents of Hyndman, gathered at the Hyndman school for direction and information

8

as to what happened. Shortly thereafter, Ms. Diehl was escorted back to her house by a CSX employee to collect necessary medications.

22.    Ms. Diehl had two dogs that she was forced to leave in her house unattended for nearly 48 hours with no one to feed them, calm them, or to let them out of the house so that they could relieve themselves outside. After Ms. Diehl was reunited with her dogs, she was required to professionally board one of them for approximately two weeks.

23.    By the time Ms. Diehl was permitted to return to her home, the food in her refrigerator had expired and had to be thrown away.

24.    Following her return home, CSX was operating 24 hours a day at the Derailment site for approximately three months. During these operations, CSX was utilizing intense, bright, exterior lighting to illuminate the site while it was dark. This lighting, while in use, significantly interfered with the use and enjoyment of Ms. Diehl's property and the property of the Proposed Class.

25.    During these operations, CSX was operating heavy machinery to lift, move, drop and maneuver railcars causing excessive, extreme noise that significantly interfered with the quiet enjoyment and use of Ms. Diehl's property and the property of the Proposed Class.

26.    During these operations, CSX was using machinery to cut, weld and/or burn railcars which created noxious fumes, smoke, and odors that Ms. Diehl and the Proposed Class could not escape, even while inside of their homes. These noxious fumes, smoke, and odors significantly interfered with the quiet enjoyment and use of Ms. Diehl's property and the property of the Proposed Class.

27.    Ms. Diehl, in the years prior to the Derailment, would prepare and can vegetables that were grown by her husband in her garden which is located in the mandatory evacuation

zone. Most years Ms. Diehl would can approximately 36 one-quart jars of salsa and another 36 one-quart jars of whole tomatoes. Because of the Derailment, Ms. Diehl was not able to can any vegetables from her garden in 2017.

28.     As a result of the Derailment Ms. Diehl and the Proposed Class suffered property damages, aggravation, inconvenience, fear, anxiety, and mental anguish. Ms. Diehl and the Proposed Class also incurred out-of-pocket expenses as a result of the CSX Derailment.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

30.     Plaintiff brings this class action under Pa.R.Civ.P. 1701 et seq. to recover damages, interest, attorneys' fees, punitive damages and any statutory penalties/remedies and other relief for herself and the Proposed Class of individuals who were mandatorily evacuated from their homes because of the CSX Derailment as set forth herein.

31.     Only a class action will provide Plaintiff and the Proposed Class with any possibility of relief. Plaintiff and the Proposed Class are therefore entitled to a class-wide remedy.

32.     Plaintiff and the Proposed Class seek an award of interest and attorneys' fees for the damages and invasions caused by CSX's conduct as set forth above.

33.     This action is properly brought as a class action for the following reasons:

a)     Numerosity: The class consists of approximately one thousand residents of Hyndman and is so numerous that joinder of all Proposed Class members is impractical.

b)     Existence and Predominance of Common Questions of Fact and Law: There exist questions of law and fact common to the class which predominate over any questions affecting only individual Proposed Class members, including:

      i.   Whether CSX caused the Derailment;

     ii.   Whether CSX is liable to Plaintiff and the Proposed Class for damages as a result of the Derailment;

    iii.   Whether CSX has created a private nuisance as a result of the misuse of its property as set forth above;

    iv.   Whether CSX was negligent in causing the Derailment;

     v.   Whether CSX is liable for punitive damages as a result of its actions as set forth above;

    vi.   Whether Defendant is liable to Plaintiff and the Proposed Class and the measure of damages;

   vii.   The extent and measure of class-wide damages, and the nature of other appropriate relief; and

  viii.   Whether Plaintiff and the Proposed Class are entitled to damages and what are the appropriate measures of such damages.

c)     Typicality: Plaintiff's claims are typical of the claims of the Proposed Class as set forth herein. In common with all Proposed Class members, Plaintiff incurred damages as a result of the Derailment caused by CSX as set forth herein.

      i.   Plaintiff's claims are typical of the claims of the Proposed Class in that the representative Plaintiff, like all Proposed Class Members, has suffered the same kind of harm as other Proposed Class members. Furthermore, the

11

factual basis of Defendant's misconduct is common to Plaintiff's and the Proposed Class Members' claims and represent a common thread resulting in injury to Plaintiff and all Proposed Class Members.

d)      Adequacy: Pursuant to *Pa. R.C.P. No. 1709*, Plaintiff will fairly and adequately protect the interests of the Proposed Class and has no conflict of interest in the maintenance of the class action. Plaintiff has or can acquire adequate financial resources to assure that the interests of the class will not be harmed. Plaintiff has retained counsel who are able and experienced in class action litigation, have no conflict of interest and will fairly and adequately protect the interests of the class.

e)      Superiority: Plaintiff and the Proposed Class have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Proposed Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Proposed Class Member claims, it is likely that only a few Proposed Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Proposed Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method compared to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

12

f) It is believed and therefore averred that no other actions have been filed against Defendant CSX relative to the allegations that comprise this class action.

g) Defendant CSX has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

34. Plaintiff brings this action on behalf of herself and all members of the proposed class, as set forth below, who have been impacted by the Train Derailment as follows:

a) All natural persons who resided within and had an interest in real property within the mandatory evacuation zone of the Train Derailment at the time of the Train Derailment.

## COUNT I
### (NEGLIGENCE)

35. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

36. The Derailment and resulting damages to Plaintiff and the Proposed Class were caused and/or contributed to by the negligent, careless, willful, wanton, outrageous, and/or reckless conduct of Defendant CSX in general and in the following particulars:

a) In causing the Derailment;

b) In violating its own Operating Rules regarding the operation of the Train when Defendant CSX knew or should have known it was unsafe to operate;

c) In intentionally, willfully, wantonly, outrageously, negligently and/or recklessly directing or ordering the continued operation of the Train when Defendant CSX knew or should have known that the Train was unsafe to operate in conscious disregard for the rights and safety of Plaintiff and the Proposed Class;

13

d)     In failing to properly and appropriately train its employees on how to safely operate the Train;

e)     In failing to properly and appropriately train its employees on how to safely, thoroughly, and competently inspect the Train;

f)     In failing to properly and appropriately train its employees on how to safely, thoroughly, and competently repair the Train;

g)     In failing to ensure that the Train was safe to operate;

h)     In intentionally, willfully, wantonly, negligently, carelessly, outrageously and/or recklessly failing to consider the steep declining grade on which Defendant CSX ordered its crew to operate the train, which was not safe to operate, in conscious, reckless disregard for the rights and safety of Plaintiff and the Proposed Class;

i)     In failing to properly and appropriately train its employees on how to safely and competently apply handbrakes on the Train when they knew or should have known that it was not safe to operate;

j)     In failing to properly and appropriately train its employees on how to safely and competently apply dynamic braking on the Trian when they knew or should have known that it was not safe to operate;

k)     In failing to properly and appropriately train its employees on how to safely and competently arrange the railcars for transport as part of the Train;

l)     In failing to properly and appropriately train its employees on how to safely and competently avoid a derailment;

m)     In failing to keep an adequate lookout for the condition of the Train and railcars from which it would have been obvious that the Train was dragging a derailed railcar. As a result, Defendant CSX failed to stop the Train in time to prevent the railcar from causing or contributing to the Derailment;

n)     In failing to ensure that its nearest trackside overheat sensor (called a "defect detector" or "hot-box detector") was in proper operating order or in failing to detect the overheated wheels on the train or in ignoring the warning provided by the overheat sensor;

o)     In failing to properly inspect the railcars that derailed and breached before the operation of the Train that resulted in the derailment and fire;

14

p)      In failing to recognize that the Train was in an unsafe condition, when Defendant CSX knew or should have known that it was, and in continuing to operate the Train in conscious, reckless disregard for the rights and safety of Plaintiff and the Proposed Class;

q)      In negligently, carelessly, knowingly, intentionally, willfully, wantonly, outrageously and/or recklessly continuing to operate the Train when Defendant CSX knew or should have known that the Train was not safe to operate in conscious, reckless disregard for the rights and safety of Plaintiff and the Proposed Class;

r)      In causing the forced evacuation of approximately 1,000 people, within a one-mile radius of the Derailment, from two days to multiple weeks, as a result of Defendant CSX's actions, as set forth above and below, and the resulting Derailment;

s)      In willfully, wantonly, outrageously, carelessly, negligently, and/or recklessly ordering the continued operation of the Train, which Defendant CSX knew or should have known was unsafe to operate, on a steeply declining grade, in conscious disregard for the rights and safety of Plaintiff and the Proposed Class;

t)      In causing intense, disruptive, excessive, intrusively bright lights which invaded the property interests of Plaintiff and the Proposed Class and interfered with the quiet enjoyment and use of Plaintiff's and the Proposed Class' property at all hours of the night during CSX's cleanup of the Derailment;

u)      In causing jarring, disruptive, excessive, intrusively loud noise which invaded the property interests of Plaintiff and the Proposed Class and interfered with the quiet enjoyment and use of Plaintiff's and the Proposed Class' property during the Derailment and at all hours of the day and night during CSX's cleanup of the Derailment;

v)      In causing intense, disruptive, excessive, permeating, noxious fumes, smoke, and odors which significantly invaded the property interests of Plaintiff and the Proposed Class and interfered with the quiet enjoyment and use of Plaintiff's and the Proposed Class' property during the Derailment and at all hours of the day and night during CSX's cleanup of the Derailment;

37.     Defendant CSX owes a duty of care to Plaintiff and the Proposed Class to design, operate, inspect, maintain, and repair its trains and railroad tracks to prevent derailments that would cause fires and otherwise endanger the surrounding community, including the duty to

comply with all applicable federal and state regulations, industry safety standards, and CSX Operating Rules. Defendant knew or reasonably should have known that a breach of these duties would result in damages to Plaintiff and the Proposed Class of the types which occurred in Hyndman, Pennsylvania.

38.     Specifically, Defendant CSX owes a duty of care to Plaintiff and the Proposed Class to adequately inspect rail cars by a qualified inspector before operating a train, including a duty to comply with 49 C.F.R. §§ 215.9, 215.11, and 215.13, CSX Operating Rules, and industry standards.

39.     Defendant CSX owes a duty of care to Plaintiff and the Proposed Class to keep a lookout during operation of a train so that it can determine if a rail car has derailed and immediately stop a train if a derailment has occurred, including a duty to comply with CSX Operating Rules and industry standards.

40.     Defendant CSX also owes a duty of care to Plaintiff and the Proposed Class to control, mitigate, and remediate toxic chemical releases from the derailment of its trains and to extinguish toxic chemical fires as quickly and safely as possible.

41.     Among other breaches, Defendant CSX breached its duty of care to Plaintiff and the Proposed Class by failing to adequately inspect the 35th railcar that initially derailed on August 2, 2017, prior to operation of the Train, including violations of 49 C.F.R. §§ 215.9, 215.11, and 215.13, CSX Operating Rules, and industry standards.

42.     Among other breaches, Defendant CSX breached its duty of care to Plaintiff and the Proposed Class by failing to prevent the operation of the Train with the damaged and/or defective braking system, including violation of 49 C.F.R. §§ 215.9, 215.115, CSX Operating Rules, and industry standards.

16

43.     Among other breaches, Defendant CSX breached its duty of care to Plaintiff and the Proposed Class by failing to keep adequate lookout and immediately stop the Train during the 1.7 miles CSX dragged the derailed 35th railcar before it completely derailed, causing or contributing to the derailment of the other railcars, which is also a violation of CSX Operating Rules and industry standards.

44.     Among other breaches, Defendant CSX breached its duty of care to Plaintiff and the Proposed Class by causing the Derailment and resulting fire and in failing to control, mitigate, and remediate the release of toxic chemicals by failing to extinguish the toxic chemical fire as quickly and safely as possible.

45.     At all times relevant to this matter, Defendant CSX was in control of the Train that derailed, and the tank car that ruptured and caught fire, and the tracks upon which the Train was operated. The Derailment and fire that occurred are the types of occurrences that do not ordinarily occur in the absence of negligence, and therefore, under Pennsylvania law and the doctrine of *res ipsa loquitur*, the jury can infer negligence.

46.     Each of the breaches of duty set forth herein resulted in damages to Plaintiff, and the Proposed Class as set forth herein.

47.     The applicable federal regulations set forth above were each enacted to protect a class of citizens which includes the Plaintiff and the Proposed Class. The damages to Plaintiff and Proposed Class are of the types that are prohibited by these statutes and regulations. Therefore, Defendant's violations constitute negligence *per se*.

48.     If Defendant's violations of statutes and regulations do not constitute negligence *per se*, they are strong evidence of negligence, in that the statutory and regulatory requirements violated by Defendant establish a minimum duty of care which was breached by Defendant.

17

49.     Defendant CSX's intentional, willful, wanton, negligent, careless, outrageous, and/or reckless conduct as set forth herein was the proximate cause of damages to Plaintiff and the Proposed Class as set forth below:

     a)     In being evacuated from their property;

     b)     In being deprived of the quite enjoyment of their property;

     c)     In having their property rights invaded;

     d)     In the loss of use and enjoyment of their property; and

     e)     In being forcibly subjected to undue aggravation and inconvenience.

**WHEREFORE,** Plaintiff and the Proposed Class respectfully demand judgment against Defendant CSX in an amount in excess of the jurisdictional limits of a board of arbitrators of this Court along with punitive damages, interest, and attorneys' fees and costs.

**JURY TRIAL DEMANDED.**

## COUNT II

### PRIVATE NUISANCE
### CAUSED BY THE DERAILMENT

50.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

51.     Plaintiff and the members of the Proposed Class, at all times relevant to this action, had an ownership or possessory interest in real property in or near Hyndman, Pennsylvania that was within the geographic boundaries of the mandatory evacuation area as a result of the Derailment.

52.     Through its willful, wanton, outrageous, reckless, and/or negligent acts and omissions in causing or contributing to the Derailment and fire, as set forth above, Defendant caused an intentional, unreasonable, negligent, and/or reckless invasion of Plaintiff's and the

18

Proposed Class' interest in the private use and enjoyment of their property as discussed herein. Defendant's invasion caused a significant harm, of a kind that would be, and was, suffered by normal people in the community and by property in normal condition and used for a normal purpose in the community.

53.    Defendant's willful, wanton, outrageous, reckless, and/or negligent acts and omissions in causing or contributing to the Derailment and fire forced the evacuation of Plaintiff and the Proposed Class from their homes or forced them to shelter in place until it was deemed safe by Defendant CSX and emergency personnel for them to return or emerge which took from two days to multiple weeks.

54.    The Derailment and resulting fire, toxic smoke, and threat of explosion resulted in the mandatory evacuation of Plaintiff and the Proposed Class which invaded, annoyed, and disturbed their interest in the private use and enjoyment of their property, and rendered the property's ordinary use of physical occupation uncomfortable, unsafe and/or impossible. The Derailment and resulting toxic chemical fire and threat of explosions, resulted in the evacuation of Plaintiff and the Proposed Class, endangered their life and health, gave offense to the senses, and prohibited the reasonable and comfortable use of their property.

55.    The private nuisance created by Defendant is the direct cause of damages to Plaintiff and the Proposed Class in the form of the loss of use and enjoyment of their property, aggravation and inconvenience, fear, anxiety, and mental anguish.

56.    Defendant is liable for the damages suffered by Plaintiff and the Proposed Class as a result of Defendant's willful, wanton, outrageous, reckless, and/or negligent creation, as set forth above, of a private nuisance.

**WHEREFORE,** Plaintiff and the Proposed Class respectfully demand judgment against Defendant CSX in an amount in excess of the jurisdictional limits of a board of arbitrators of this Court along with punitive damages, interest, and attorneys' fees and costs.

**JURY TRIAL DEMANDED.**

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff and members of the above Proposed Class respectfully request this Court to grant the following relief:

A. Determine that the claims alleged herein may be maintained as a class action under the Pennsylvania Rules of Civil Procedure, and issue an order certifying the Class;

B. Appoint Plaintiff as the representative of the Proposed Class and her counsel as Class Counsel;

C. Award all actual, general, special, incidental, statutory, punitive, attorneys' fees, interest, costs and consequential damages to which Plaintiff and Class Members are entitled;

D. Award pre-judgment and post-judgment interest on such monetary relief;

E. Award all other relief deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

**Plaintiff hereby demands a trial by jury on all claims and issues.**

Respectfully Submitted By:

MARCUS & MACK, P.C.

Troy M. Frederick, Esquire
Attorney for Plaintiffs
Identification No: 207461
57 South Sixth Street
Indiana, PA 15701
Phone: (724) 349-5602
Fax: (724) 349-8362

Dated: May _21_ , 2018

## **VERIFICATION**

I, Denora Diehl, verify that the averments of the foregoing document are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C. S. A. §4904, relating to unsworn falsification to authorities.

Denora Diehl

# EXHIBIT 1



PENNSYLVANIA RAILROAD MAP
MARCH 2018

# EXHIBIT 2



# PRELIMINARY REPORT

# RAILROAD

## CSX Transportation, Train Derailment with Hazardous Materials Release

**Hyndman, PA**
**August 2, 2017**
**DCA17FR011**

*The information in this report is preliminary and will be*
*supplemented or corrected during the course of the investigation.*

On August 2, 2017, about 4:54 a.m. eastern daylight time, CSX Transportation (CSX) train Q38831, with 5 locomotives and 178 railcars (128 loaded and 50 empty), derailed railcars 33 through 65 in Hyndman Borough, Bedford County, Pennsylvania. Three hazardous material tank cars were breached and released material: one containing propane, one containing asphalt, and one containing molten sulfur. Both the propane tank car and the molten sulfur tank released caught fire. (See figure 1.) About 1,000 residents within a 1-mile radius were evacuated and several highway-railroad grade crossings were closed. There were no injuries or fatalities. On August 5, about 12:00 p.m., the evacuation was lifted. At the time of the accident, the sky was clear, visibility was 10 miles, and the temperature was 64°F.



**Figure 1:** Accident scene. (Photograph courtesy of Pennsylvania State Police.)

Two train crews were involved in the movement of the train before the accident. The first crew stopped the train on a descending grade after encountering air brake problems. The crew

applied 58 hand brakes while inspecting and recharging the air brake system. The conductor of this first crew found an air leak on a railcar about 20 railcars from the rear of the train. A CSX mechanical employee arrived to repair the air leak. However, by the time this issue was resolved, the crew did not have enough remaining duty time to complete the trip. Therefore, CSX relieved them with a new train crew.

The second crew, thinking the train may still have air brake problems, kept all 58 hand brakes applied and unsuccessfully tried to pull the train down the hill. The conductor of the second crew then released the first 25 hand brakes, leaving 33 hand brakes still applied. The engineer applied a minimum air brake application and started the train with locomotive power down the grade. The train speed varied from 20 to 30 mph. The engineer switched from locomotive power to dynamic braking three times before the train derailed.

National Transportation Safety Board (NTSB) investigators determined that the 35th railcar derailed one set of wheels on a curve 1.7 miles before the location of the general derailment and fire. When the derailed railcar reached a highway-railroad grade crossing, the railcar moved further off the rail, initiating the derailment of the other railcars. NTSB investigators discovered that several railcar wheels east and west of the derailed cars had flat spots and built-up tread from the hand brakes not allowing the wheels to rotate, and bluing due to brake pad friction.

The weight of the train from the 1st railcar in the consist to the 35th, was about 1,631 tons. The weight of the remaining 143 railcars trailing the 35th railcar was about 16,621 tons. The 35th railcar from the front of the train was an empty high-sided gondola within a block of 27 empty railcars. NTSB is investigating many factors into the cause of the derailment, including the length, make-up, and operation of the train, as well as the condition of the railcars and track.

Fifteen tank cars transporting hazardous materials were involved in the derailment, including three tank cars containing propane, eight tank cars containing molten sulfur, two tank cars containing asphalt, and two tank cars containing phosphoric acid residue.

The 46th car from the front of the train, a 23,467-gallon specification US Department of Transportation (DOT)-111 general service tank car, released its load of elevated temperature asphalt from a bottom outlet valve that opened during the derailment sequence.[1] The released asphalt pooled and solidified near the railcar pileup. The 49th railcar from the front of the train, a 13,880-gallon specification DOT-111 general service tank car, released its load of molten sulfur from two tank shell tears. The released molten sulfur ignited and burned for more than 48 hours.

The 53rd car, a 33,710-gallon specification DOT-112 pressure tank car, released its load of odorized propane from a punctured tank shell.[2] The puncture measured about 3 1/4-inch in length and about 1/4-inch wide. Released propane gas escaped through the void space between the jacket and tank shell and emerged burning vigorously at several locations on the tank car for more than 48 hours. A 6-inch-high bulge, measuring 27 inches longitudinally and 56 inches

---

[1] *General service tank cars* typically transport a wide variety of liquid and solid hazardous materials, as well as nonregulated commodities.

[2] *Pressure tank cars* are stronger than general service tank cars because their thicker tanks allow them to withstand higher internal pressures. These tank cars typically transport liquefied compressed gases, poison/toxic inhalation hazard materials, reactive materials, and some corrosive materials.

circumferentially, formed in the tank shell above the body bolster near one point of fire exposure (See figure 2).



**Figure 2:** Bulge in the tank shell of the burning tank car. (Photograph courtesy of CSX.)

Portions of the propane tank car were removed and shipped to the NTSB Materials Laboratory for examination.

Parties to the investigation are the Federal Railroad Administration, CSX Transportation, the Brotherhood of Locomotive Engineers and Trainmen, the International Association of Sheet Metal, Air, Rail and Transportation Workers, and the Pennsylvania Public Utilities Commission.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice of Removal has been furnished to the following recipients by U.S. Mail, postage prepaid, this 8th day of June, 2018:

Troy M. Frederick, Esquire
57 South Sixth St., P.O. Box 1107
Indiana, PA 15701
(724) 349-5602

*/s/  Jeffrey A. Jackson*
Jeffrey A. Jackson, Esquire
Attorney for CSX Transportation, Inc.