# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DENORA DIEHL, *on behalf of herself and all others similarly situated,* ) ) ) | Case No. 3:18-cv-122 |
| Plaintiff, ) ) | JUDGE KIM R. GIBSON |
| v. ) ) | |
| CSX TRANSPORTATION, INC., ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

### I. Introduction

This case arises out of a train derailment that occurred near Hyndman, Pennsylvania in August 2017. Plaintiff Denora Diehl ("Plaintiff") filed a Class Action Complaint alleging that Defendant CSX Transportation, Inc. ("Defendant") negligently operated its train, causing it to derail. Plaintiff avers that she and other proposed class members ("Proposed Class") were subsequently forced to evacuate their homes and subjected to inconvenience as Defendant repaired the derailment site.

Pending before the Court is the Motion to Dismiss filed by Defendant on July 20, 2018. (ECF No. 7.) Plaintiff filed her Memorandum in Opposition to Defendant's Motion to Dismiss on August 23, 2018. (ECF No. 22.) Therefore, the instant Motion has been fully briefed and is ripe for disposition.

For the reasons that follow, this Court will **GRANT IN PART** and **DENY IN PART** Defendant's Motion to Dismiss (ECF No. 7).

## II.    Subject Matter Jurisdiction & Venue

Pursuant to 28 U.S.C. § 1332(d)(2), the Court has "original jurisdiction [over] any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which—(A) any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). In order to receive the benefit of § 1332(d)(2), the proposed class of plaintiffs must have at least 100 members. *Id.* § 1332(d)(5)(B).

Here, Plaintiff is a resident of Hyndman, Bedford County, Pennsylvania. (ECF No. 1-1 ¶ 1.) Plaintiff brings this proposed class action on behalf of Proposed Class, which consists of approximately 1,000 other residents of Hyndman. (*Id.* ¶ 33(a).) Defendant is a corporation organized under the laws of the State of Virginia with its principal place of business in Florida. (*Id.* ¶ 2.) Therefore, there is diversity between Defendant and Plaintiff.

Furthermore, the $5 million amount in controversy requirement is met. Although Plaintiff does not specify the amount of damages sought, Plaintiff brings claims of negligence and private nuisance for herself and on behalf of Proposed Class, alleging that she was forcibly evacuated from her property; deprived of quiet enjoyment of her property; subjected to loss of use of her property; and subjected to inconvenience, fear, anxiety, and mental anguish. (*Id.* ¶¶ 49, 55.) Plaintiff seeks actual and punitive damages for her and Proposed Class. (*Id.* at 33.) Based on the nature of Plaintiff's claims and the fact that claims for punitive damages, alone, "'will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum,'" *Huber v. Taylor*, 532 F.3d 237, 244 (3d Cir. 2008) (quoting *Golden*

*ex rel. Golden v. Golden*, 382 F.3d 348 (3d Cir. 2004), *abrogated on other grounds*), this Court cannot say to a legal certainty that the amount in controversy does not reach the requisite $5 million threshold. *See Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 395 (3d Cir. 2016) ("'It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.'" (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938))). Accordingly, this Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2).

Venue is proper pursuant to 28 U.S.C. § 1441(a). *See Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 666 (1953) (explaining that the proper venue of a removed action is "the district court of the United States for the district and division embracing the place where such [removed] action is pending").

## III.    Procedural History

Plaintiff initiated this action by filing a Class Action Complaint in the Court of Common Pleas of Bedford County, Pennsylvania, on May 22, 2018. (ECF No. 1.) Defendant filed a Notice of Removal with this Court on June 8, 2018. (*Id.*) Defendant then filed the instant Motion to Dismiss and accompanying brief in support thereof on July 20, 2018.[1] (ECF Nos. 7, 8.) Plaintiff submitted her Memorandum in Opposition to Defendant CSXT's Motion to Dismiss on August 23, 2018.[2] (ECF No. 22.) On August 31, 2018, Defendant filed

---

[1] By Order of June 19, 2018, the Court extended Defendant's response deadline until July 20, 2018. (*See* ECF No. 6.)

[2] By Order of August 9, 2018, the Court extended Plaintiff's response deadline until August 23, 2018. (*See* ECF No. 12.)

a Reply in Support of its Motion to Dismiss (ECF No. 25), after receiving leave of this Court to do so (ECF No. 24).

## IV. Factual Allegations Set Forth in the Complaint

For the purposes of deciding Defendant's Motion to Dismiss, the Court accepts the allegations of Plaintiff's Complaint as true. *See infra* Part V.

According to the Complaint, Plaintiff is a resident of and property owner in Hyndman, Pennsylvania. (ECF No. 1-1 ¶ 1.) Plaintiff's allegations can be divided into two parts: the derailment and the aftermath of the derailment.

### A. The Derailment[3]

On August 2, 2017, Defendant was operating a train that was traveling from Illinois to New York, a route that took the train through Hyndman. (*Id.* ¶ 6.) This train, which consisted of five locomotives and 178 railcars, was carrying mixed freight, including propane, molten sulfur, asphalt, and phosphoric acid residue. (*Id.* ¶¶ 5, 8.)

As the train approached Hyndman, Defendant's crew stopped the train because it was experiencing air brake problems. (*Id.* ¶ 9.) The crew applied 58 hand brakes during this stop, as the train was on a descending grade. (*Id.*) Upon inspection, the crew discovered a leak in the brake system, which an employee of Defendant attempted to repair. (*Id.*) However, according to the Complaint, this repair was unsuccessful. (*Id.*)

---

[3] Plaintiff generally alleges that the actions taken by Defendant leading up to the derailment, which are discussed more fully in this Section, were done in violation of Defendant's operating rules. (ECF No. 1-1 ¶ 36(b).) Furthermore, Plaintiff claims that these improper actions were taken due to Defendant's failure to properly train its employees. (*Id.* ¶ 36(d)-(l).)

-4-

During the course of the inspection and attempted repair of the brake system, a new crew took over for the original crew. (*Id.*) Defendant ordered this new crew to finish the route, and the new crew complied, although the crew knew that the problem with the air brake system persisted. (*Id.* ¶ 10.) Because the crew members knew that the brake problems continued, they first attempted to operate the train with the 58 hand brakes still applied. (*Id.* ¶ 11.) When they were unable to move the train with the hand brakes applied, the conductor released the first 25 hand brakes, leaving 33 hand brakes applied. (*Id.*) The crew was then able to move the train, although the Complaint alleges that the crew knew or should have known that operating the train in such a manner was unsafe. (*Id.*)

As the train proceeded to Hyndman, the 35th railcar partially derailed. (*Id.* ¶ 13.) However, Defendant's crew continued to operate the train, in spite of the fact that the crew knew or should have known about the derailment and that the continued operation of the train was unsafe. (*Id.*) The crew thus dragged the derailed railcar for two miles before reaching a railroad crossing. (*Id.* ¶ 14.) Upon reaching the crossing, the derailed railcar moved further off the rail, causing the derailment of the 33rd to the 65th railcars near Hyndman.[4] (*Id.* ¶¶ 8, 14.) Some of these derailed railcars had been transporting hazardous materials, including propane and molten sulfur (*Id.* ¶ 8), and the derailment of these cars caused a fire that burned for more than two days. (*Id.*) Due to the derailment, approximately 1,000 people were evacuated from their homes. (*Id.* ¶ 7.)

---

[4] Plaintiff also alleges that two other factors contributed to the derailment. First, the crew's operation of the train with the 33 hand brakes applied caused several wheels to become flat in certain spots, preventing them from rotating properly. (ECF No. 1-1 ¶ 15.) Second, the railcars' weight was not properly distributed, as the front 35 railcars weighed 1,631 tons, while the remaining 143 railcars weighed 16,621 tons. (*Id.* ¶ 16.)

## B. The Aftermath of the Derailment

On August 2, 2017 at 5:00 a.m., Plaintiff evacuated her home due to the derailment. (*Id.* ¶ 20.) Other residents of Hyndman were also evacuated. (*Id.* ¶ 21.) Evacuated residents were not permitted to return to their homes for periods of two days to multiple weeks. (*Id.* ¶ 20.) During this period, Plaintiff was forced to leave two dogs unattended in her home for 48 hours. (*Id.* ¶ 22.) After she was reunited with her dogs, she was required to professionally board one of them for approximately two weeks. (*Id.*) Furthermore, by the time Plaintiff returned home, the food in her refrigerator had expired and had to be thrown away. (*Id.* ¶ 23.) Finally, because of the derailment, Plaintiff was not able to can any vegetables from her garden in 2017.[5] (*Id.* ¶ 27.)

Following Plaintiff's return home, Defendant worked at the derailment site 24 hours a day for three months. (*Id.* ¶ 24.) Defendant used bright lights to illuminate the site while it was dark; operated heavy machinery, which caused extreme noise; and used machinery to cut, weld, and burn railcars, creating noxious fumes and odors that Plaintiff could smell inside her home. (*Id.* ¶¶ 24-26.) Plaintiff alleges that Defendant's actions caused Plaintiff aggravation, fear, and anxiety; "rendered the property's ordinary use of physical occupation uncomfortable, unsafe and/or impossible"; and "endangered [Plaintiff's] life and health, gave offense to the senses, and prohibited the reasonable and comfortable use of [the] property." (*Id.* ¶¶ 24-28, 54.)

---

[5] In addition to the aforementioned specific injuries, Plaintiff generally alleges that the following damage was caused by the derailment: (1) forced evacuation from her property; (2) deprivation of the use and enjoyment of her property; and (3) invasion of her property rights. (ECF No. 1-1 ¶ 49.)

## V. Standard of Review

A complaint may be dismissed under Federal Rule of Civil Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But, detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[6] First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth.") (citation omitted). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[6] Although the Supreme Court described the process as a "two-pronged approach," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the Court noted the elements of the pertinent claim before proceeding with that approach, *id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

alleged." *Id.; see also Connelly,* 809 F.3d at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

## VI. Discussion

Defendant argues for dismissal based on (1) the economic loss doctrine, (2) failure to state a nuisance claim, (3) failure to allege behavior that supports a request for punitive damages, and (4) federal preemption. (ECF No. 7 at 1.) The Court first addresses preemption, as this issue affects the outcome of Defendant's other contentions. The Court then analyzes the rest of Defendant's arguments in turn.

### A. Federal Preemption

Defendant argues that Plaintiff's claims are preempted by federal law, including by the Interstate Commerce Commission Termination Act, the Federal Railroad Safety Act, and the Hazardous Materials Transportation Act. (*Id.*)

#### 1. Federal Preemption Generally

Under the Supremacy Clause of the United States Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Therefore, when state and federal laws conflict, federal law preempts state law. *Altria Grp., Inc. v. Good,* 555 U.S. 70, 76 (2008); *Gibbons v. Ogden,* 22 U.S. 1, 211 (1824) (explaining that if a validly-enacted state law conflicts with an act of Congress, "the law of the State, though enacted in the exercise of powers not controverted, must yield" to the congressional act). Preemption takes multiple forms; specifically, a state law may be expressly preempted, impliedly preempted under field preemption, or impliedly preempted under conflict

preemption. Express preemption occurs when Congress "indicate[s] pre-emptive intent through a statute's express language." *Altria Grp.*, 555 U.S. at 543. However, "[i]f a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress'[s] displacement of state law still remains." *Id.* The two types of implied preemption occur "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.*

In order to determine whether federal law preempts state law, the court begins by considering Congress's purpose in enacting the federal law at issue. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *see also Hines v. Davidowitz*, 312 U.S. 52, 68 (1941) ("Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."). The court must also "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

These general principles apply to the preemption questions discussed below, in addition to the specific preemption rules associated with each federal statute at issue.

## 2. Interstate Commerce Commission Termination Act of 1995

In 1995, Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA" or "Act"), 49 U.S.C. §§ 10101 *et seq.*, to "operate transportation facilities and equipment without detriment to the public health and safety" and "minimize the need for

Federal regulatory control over the rail transportation system." *Id.* § 10101. Under the

ICCTA, Congress established the Surface Transportation Board ("STB" or "Board"), giving

the Board exclusive jurisdiction over the following:

> (1) transportation by rail carriers, and the remedies provided in this part
> with respect to rates, classifications, rules (including car service,
> interchange, and other operating rules), practices, routes, services, and
> facilities of such carriers; and
> (2) the construction, acquisition, operation, abandonment, or discontinuance
> of spur, industrial, team, switching, or side tracks, or facilities, even if the
> tracks are located, or intended to be located, entirely in one State.

*Id.* § 10501(b). Furthermore, the ICCTA contains an express preemption provision which

indicates that the remedies provided by the Act "with respect to the regulation of rail

transportation are exclusive and preempt the remedies provided under Federal or State

law." *Id.*

In spite of its express preemption provision, courts and the STB have recognized

that the ICCTA does not preempt all state laws that affect transportation by rail carriers.

*N.Y. Susquehanna & W. Ry. Corp. v. Jackson,* 500 F.3d 238, 252 (3d Cir. 2007). Instead, the Act

"preempts all 'state laws that may reasonably be said to have the effect of managing or

governing rail transportation, while permitting the continued application of laws having a

more remote or incidental effect on rail transportation.'" *Id.* (quoting *Fla. E. Coast Ry. Co. v.

City of W. Palm Beach,* 266 F.3d 1324, 1331 (11th Cir. 2001)). The Court of Appeals for the

Third Circuit has applied the following test to determine whether a state law "manages or

governs" rail transportation and is thus preempted: (1) the law must not discriminate

against rail carriage; and (2) the law must not unreasonably burden rail carriage. *Id.* at 254.

With regard to the first prong of this test, a law does not discriminate against rail carriage

if it "address[es] state concerns generally, without targeting the railroad industry." *Id.* Second, a state law does not "unreasonably burden rail carriage" if it is not "so draconian that it prevents the railroad from carrying out its business in a sensible fashion." *Id.* This test has been applied in the context of state law tort claims against railroads, as are involved in this case. *See MD Mall Assocs., LLC v. CSX Transp., Inc.,* 288 F. Supp. 3d 565, 590, 595-96 (E.D. Pa. 2017).

Against this backdrop, Defendant contends that Plaintiff's claims are preempted by the ICCTA to the extent they are premised on the following factual allegations: (1) Plaintiff's allegation that the train was not organized in a way that safely distributed the weight of the railcars (ECF No. 1-1 ¶ 16); and (2) Plaintiff's allegation that Defendant created excessive noise and noxious fumes and operated bright lights while working at the derailment site (*id.* ¶¶ 24-26, 36(t)-(v)). (ECF No. 8 at 18.)

Applying the test adopted by the Third Circuit, Plaintiff's negligence and nuisance claims are based on generally-applicable tort law that does not specifically target rail carriers for regulation. Therefore, the first prong of the ICCTA preemption test is satisfied and preemption is not triggered. *See MD Mall Assocs.,* 288 F. Supp. 3d at 595.

However, the second prong of the Third Circuit's test poses more difficulty to Plaintiff at this stage of the litigation. Plaintiff's allegations that Defendant's train was not organized in a safe manner and that Defendant created excessive noise and noxious fumes at the derailment site clearly involve the operation and construction of rail carrier tracks and facilities, such that they fall within the exclusive jurisdiction of the STB. If Defendant

were unable to undergo specific construction projects related to its rail operations because

a court held such operations to be negligent or a nuisance, or if its ability to undergo such

projects was delayed or regulated based on a state tort action, its ability to operate as a rail

carrier would be impeded. *See Cities of Auburn and Kent*, S.T.B. Finance Docket No. 33200,

1997 WL 362017, at *5 (S.T.B. July 1, 1997) (explaining that state permitting requirements

for railroad construction projects could burden interstate commerce).

This Court's analysis of this issue is informed by decisions of other courts that have

found claims related to the noise and fumes produced by railroad facilities to be preempted.

*See Suchon v. Wis. Cent. Ltd.*, No. 04-C-0379-C, 2005 WL 568057, at *4 (W.D. Wis. Feb. 23,

2005) (finding that the ICCTA preempted Wisconsin nuisance law because the plaintiff was

ultimately trying to use a state law to affect the conduct of a railroad); *Norfolk S. Ry. Co. v.*

*City of Maple Heights*, No. 1:02CV1468, 2003 WL 26100887, at *4 (N.D. Ohio May 14, 2003)

("[C]ourts have specifically found attempts to utilize state law to control noise produced

by railroad operations to be preempted by the ICCTA."); *Rushing v. Kan. City S. Ry. Co.*, 194

F. Supp. 2d 493 (S.D. Miss. 2001) ("[A]lthough the relevant Mississippi laws of negligence

and nuisance may be construed as a [sic] exercise of the police power of the state to

safeguard the health and safety of its citizens, the Plaintiffs are attempting to use these laws

to impose regulations on the Defendant regarding the manner in which it operates its

switch yard thereby potentially interfering with interstate rail operations."); *Village of*

*Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp.*, 163 N.J. 446, 462 (2000) (finding a

nuisance claim related to the noise and air pollution produced by a rail facility to be

preempted by the ICCTA).

The Court finds that Plaintiff's negligence and nuisance claims are preempted by the ICCTA to the extent they are based on allegations regarding the order of Defendant's rail cars and the noise and fumes created by Defendant's cleanup of the derailment site.

### 3. Federal Railroad Safety Act

The Federal Railroad Safety Act ("FRSA" or "Act") was enacted by Congress in order to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The Act mandates that the Secretary of Transportation prescribe regulations "for every area of railroad safety." *Id.* § 20103(a). The preemptive effect of the Secretary's regulations is governed by § 20106, which states that "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1). To that end, states may regulate areas related to railroad safety and security until the Secretary of Transportation or the Secretary of Homeland Security issues a regulation covering that same subject matter. *Id.* § 20106(a)(2). Furthermore, while states are not allowed to regulate a subject matter on which the Secretary of Transportation has already issued regulations, nothing in the FRSA "shall be construed to preempt an action under [s]tate law seeking damages for personal injury, death, or property damage alleging that a party":

> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

-13-

> (B) has failed to comply with its own plan, rule, or standard that it
> created pursuant to a regulation or order issued by either of the
> Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is
> not compatible with subsection (a)(2).

*Id.* § 20106(b). According to the Supreme Court, these preemption provisions exhibit

"considerable solicitude for state law." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 665

(1993).

The Third Circuit has developed a two-step approach to analyzing claims of

preemption under the FRSA. First, the court must ask "whether the defendant allegedly

violated either a federal standard of care or an internal rule that was created pursuant to a

federal regulation. If so, the plaintiff's claim avoids preemption." *Zimmerman v. Norfolk S.

Corp.,* 706 F.3d 170, 178 (3d Cir. 2013). "A regulation creates a standard of care for FRSA

preemption purposes if it establishes the degree of care that the defendant—in most cases,

the railroad—must exercise." *Id.* at 179.

If no federal standard of care or internal rule was allegedly violated, the court moves

to the second step and analyzes "whether any federal regulation covers the plaintiff's

claim." *Id.* at 178. A plaintiff's claim is "covered" by a federal regulation, and therefore

preempted, if the regulation "substantially subsumes the subject matter" of the claim. *Id.*

In order to "substantially subsume" the subject matter, the regulations must do more than

simply touch upon or relate to that subject. *CSX Transp.,* 507 U.S. at 664; *Zimmerman,* 706

F.3d at 187.

Defendant argues that Plaintiff's claims are preempted by the FRSA, at least to the

extent Plaintiff seeks to impose duties beyond those set by federal law. Defendant takes

-14-

issue with Plaintiff's allegations regarding (1) Defendant's failure to appropriately train employees (ECF No. 1-1 ¶ 36(d)-(f), (i)-(l)); (2) the crew's continued operation of the train when it knew the air brake problems had not been repaired (*id.* ¶¶ 10-11, 15); (3) Defendant's failure to properly inspect the railcars prior to derailment (*id.* ¶¶ 36(o), 38, 41); (4) train speed (*id.* ¶ 11); and (5) Defendant's failure to keep an adequate lookout (*id.* ¶¶ 36(m), 39). (ECF No. 8 at 21.) The briefing on these arguments is less than thorough, but Defendant seems to contend that the second step of the above-described analysis causes preemption problems. Specifically, Defendant points to Title 49 of the Code of Federal Regulations ("C.F.R."), Parts 213, 215, 232, and 240, and claims that these Parts "cover" the aforementioned claims. (*Id.*)

In response, and also without significant discussion, Plaintiff identifies 49 C.F.R. §§ 215.9, 215.11, 215.13, 232.15, and 232.103 and argues that under the first step of the FRSA preemption analysis, Plaintiff's Complaint alleges that Defendant violated the standards of care created by the FRSA and found in these Sections.[7] (ECF No. 22 at 18.) The Court will address these arguments to the best of its ability, in spite of the limited support the parties provided for their claims.

### a. Failure to adequately train employees

In Plaintiff's discussion of Defendant's alleged failure to adequately train its employees, Plaintiff does not identify any particular section of the C.F.R. pursuant to which

---

[7] Plaintiff also repeatedly mentions that Defendant had a duty to comply with its operating rules, but never discusses the content of those operating rules. (ECF No. 1-1 ¶¶ 38-39, 41-43.) Therefore, the Court cannot consider whether Plaintiff alleges that Defendant violated an internal rule created pursuant to federal regulation. *Zimmerman*, 706 F.3d at 178.

Plaintiff's claims are brought. (*See* ECF No. 1 ¶ 36(d)-(f), (i)-(l).) Furthermore, in her briefing on this issue, Plaintiff does not mention a federal standard of care. (*See id.*) Therefore, Plaintiff does not seem to argue that Defendant violated a federal standard of care when it comes to training Defendant's employees, meaning that Plaintiff's claims cannot avoid preemption under the first step of the FRSA preemption test.

Under the second part of the test, the Court finds that federal regulations do not "cover" Plaintiff's failure to train employees claims. The only relevant regulation identified by Defendant, 49 C.F.R. § 240, extensively details "minimum Federal safety standards for the eligibility, training, testing, certification and monitoring of all locomotive engineers." 49 C.F.R. § 240.1(b). However, in this case, Plaintiff's Complaint does not specify that its claims are based only on failure to train locomotive engineers; instead, Plaintiff's Complaint alleges a failure to train employees generally. (*See* ECF No. 1-1 ¶ 36(d)-(f), (i)-(l).) *See Norfolk S. Ry. Co. v. Zeagler*, 748 S.E.2d 846, 861 (Ga. 2013) (recognizing that 49 C.F.R. Part 240 deals with qualifications of locomotive engineers). Defendant does not specifically identify any other regulation that "covers" Plaintiff's claims of inadequate training. Therefore, at this stage, the Court declines to dismiss Plaintiff's negligence count to the extent that count is based on failure to train.

### b. Negligent operation with faulty brakes

Defendant also takes issue with Plaintiff's claim that Defendant continued operating the train with faulty brakes. (ECF No. 1-1 ¶¶ 10, 11, 15, 42.) Plaintiff alleges that Defendant violated 49 C.F.R. §§ 215.9 and 215.115 by "failing to prevent the operation of the [t]rain with the damaged and/or defective braking system." (*Id.* ¶ 42.) In Plaintiff's Memorandum

in Opposition to Defendant's Motion to Dismiss (ECF No. 22), Plaintiff also claims that Defendant violated a duty of care created by 49 C.F.R. § 232.103. (*Id.* at 18.) Therefore, the Court's first undertaking is to determine whether Plaintiff alleges that Defendant violated a federal standard of care, such that Plaintiff's claims avoid preemption. *See Zimmerman*, 706 F.3d at 178.

Section 215.9 of Title 49 applies only to "railroad freight car[s] which ha[ve] any component described as defective in this part." 49 C.F.R. § 215.9. The defective components discussed in Part 215 include wheels, *id.* § 215.103, axles, *id.* § 215.105, bearing boxes, *id.* §§ 215.107, 215.109, brake beam shelves, *id.* § 215.119(f), and various other components, *see id.* §§ 215.103-215.129. However, none of these Sections discuss defective air brake systems, and Plaintiff does not point to any specific duties encompassed within Part 215 that apply directly to air brake systems. Therefore, this Court concludes that Plaintiff does not sufficiently allege that Defendant violated a federal standard of care with regard to faulty air brakes under Part 215 of Title 49 of the C.F.R.

However, Plaintiff also cites to § 232.103 of Title 49 (ECF No. 22 at 18), which lists the "[g]eneral requirements for all train brake systems." *Id.* § 232.103. Plaintiff does not give any explanation as to which provisions of § 232.103 apply to the factual circumstances of this case, but the Court finds that two provisions are particularly relevant:

(e) A train shall not move if less than 85 percent of the cars in that train have operative and effective brakes.
(f) Each car in a train shall have its air brakes in effective operating condition unless the car is being moved for repairs . . . . The air brakes on a car are not in effective operating condition if its brakes are cut-out or otherwise inoperative . . . .

*Id.* § 232.103(e), (f). These provisions establish a degree of care that Defendant must exercise. *See Zimmerman*, 706 F.3d at 179. Specifically, they require Defendant to ensure that 85 percent of the train's cars have operative brakes before moving it, and to ensure that each car has effective air brakes unless the car is being moved for repairs. Furthermore, Plaintiff alleges that Defendant violated this standard of care by operating the train without effective air brakes. (*See* ECF No. 1-1 ¶¶ 9-11, 42.) Therefore, under the first step of the FRSA preemption test, the Court finds that Plaintiff alleges that Defendant violated a federal standard of care, such that Plaintiff's claims based on operating without effective brakes avoid preemption. However, to the extent Plaintiff claims that Defendant violated duties beyond those duties contained in the aforementioned regulations and internal rules created pursuant to those regulations, *see Zimmerman*, 706 F.3d at 178, Plaintiff's claims are preempted, as the above regulations "substantially subsume" the subject matter of brake system requirements.

### c. Failure to inspect

Third, Defendant argues that Plaintiff's negligence claim is preempted by the FRSA to the extent it is based on Defendant's failure to inspect the railcars prior to derailment. (ECF No. 8 at 21.) To this end, Plaintiff alleges that Defendant was negligent in "failing to properly inspect the railcars that derailed and breached before the operation of the Train that resulted in the derailment and fire." (ECF No. 1-1 ¶ 36(o).) Plaintiff specifies that "Defendant CSX breached its duty of care to Plaintiff and the Proposed Class by failing to adequately inspect the 35[th] railcar that initially derailed on August 2, 2017, prior to the operation of the Train." (*Id.* ¶ 41.) Finally, Plaintiff alleges that Defendant "owes a duty of

care to Plaintiff and the Proposed Class to adequately inspect rail cars by a qualified inspector before operating a train, including a duty to comply with 49 C.F.R. §§ 215.9, 215.11, 215.13, CSX Operating Rules, and industry standards." (*Id.* ¶ 38.)

Plaintiff primarily relies on 49 C.F.R. §§ 215.11 and 215.13 to support her claim that she has sufficiently alleged that Defendant violated a federal standard of care. (*See* ECF No. 22 at 18.) Under § 215.11, "[e]ach railroad that operates railroad freight cars to which this part applies shall designate persons qualified to inspect railroad freight cars for compliance with this part." 49 C.F.R. § 215.11. Pursuant to § 215.13, "[a]t each location where a freight car is placed in a train, the freight car shall be inspected before the train departs." *Id.* § 215.13.

At this stage, the Court declines to find Plaintiff's negligent inspection allegations preempted because Plaintiff alleges that Defendant failed to comply with these regulations. *See Smith v. CSX Transp., Inc.*, No. 3:13 CV 2649, 2014 WL 3732622, at *3 (N.D. Ohio July 25, 2014) (declining to find FRSA preemption when the plaintiffs alleged that the defendant did not comply with inspection regulations). However, to the extent Plaintiff claims that Defendant violated duties to inspect beyond those duties contained in the aforementioned regulations, (*see, e.g.*, ECF No. 1-1 ¶¶ 38, 41 (discussing Defendant's violation of "industry standards")); *Zimmerman*, 706 F.3d at 178, Plaintiff's claims are preempted, as the above regulations "substantially subsume" the subject matter of train inspection.

### d. Inappropriate train speed

Defendant next takes issue with Plaintiff's claims to the extent they are based on inappropriate train speed. (ECF No. 8 at 21; ECF No. 1-1 ¶ 11.) It is not clear to the Court

whether Plaintiff is claiming that Defendant had a duty to conform to a particular standard of care with regard to train speed—all Plaintiff says is that Defendant's crew pulled the train down a grade while 33 hand brakes were applied, "reaching speeds of 20 to 30 mph, when they knew or should have known that it was not safe to do so." (ECF No. 1-1 ¶ 11.) To the extent Plaintiff alleges a violation of a federal standard of care, *see* 49 C.F.R. § 213.9 (describing the "maximum allowable operating speeds" for trains), her claim is not preempted.

### e. Failure to keep adequate lookout

Plaintiff's Complaint alleges that Defendant had a duty to Plaintiff "to keep a lookout during operation of a train so that it can determine if a rail car has derailed and immediately stop a train if a derailment has occurred." (ECF No. 1-1 ¶¶ 39, 42.) Plaintiff has not identified any regulations in her Complaint or Memorandum in Opposition to Defendant's Motion to Dismiss that create a federal standard of care on this issue, and Defendant similarly has cited no authority to support its assertion that this alleged duty is preempted by the FRSA. (ECF No. 8 at 21.) The Court therefore declines to dismiss these allegations.

### 4. Hazardous Materials Transportation Act

The Hazardous Materials Transportation Act ("HMTA" or "Act") was enacted "to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5101. The Act gives the Secretary of Transportation the authority to designate

certain materials as hazardous and to prescribe regulations for the transportation of those materials. *Id.* § 5103.

The HMTA contains extensive preemption provisions that provide, in part, that a state requirement is preempted if (1) complying with both the state requirement and a requirement of the HMTA or any regulations enacted pursuant to the HMTA would not be possible and (2) the state requirement, as applied or enforced, "is an obstacle to accomplishing and carrying out" the HMTA or a regulation enacted pursuant to the HMTA. *Id.* § 5125(a). In another preemption provision, the Act explains that any laws, orders, or other state requirements about any of the following subjects, that are not substantially the same as a provision of the HMTA or a regulation enacted pursuant to the HMTA, are preempted: (1) designation, description, and classification of hazardous material; (2) packing, handling, labeling, marking, and placarding of hazardous material; (3) preparation, execution, and use of shipping documents related to hazardous material; (4) written notification, recording, and reporting of the unintentional release in transportation of hazardous material; and (5) designing, manufacturing, fabricating, inspecting, marking, repairing, or testing a package or container that is represented or sold as qualified for use in transporting hazardous material in commerce. *Id.* § 5125(b)(1). The Third Circuit has articulated the following test for analyzing preemption claims under § 5125(b)(1):

> Our threshold concern, then, is to identify the contours of the non-federal law, regulation, order, or requirement at issue in the case. Once we have done so, we must ascertain (1) whether § 5125(b)(1) applies to the non-federal law, regulation, order, or requirement we have identified, and (2)

whether the non-federal requirement is 'substantively the same as' the conditions imposed by federal hazardous materials law.

*Roth v. Norfalco LLC*, 651 F.3d 367, 376 (3d Cir. 2011).

Defendant argues generally[8] that numerous of Plaintiff's allegations are preempted by the HMTA, to the extent the allegations can be read as raising claims based on transport of hazardous materials. (ECF No. 8 at 23.) In Plaintiff's allegations, Plaintiff claims that "Defendant CSX also owes a duty of care to Plaintiff and the Proposed Class to control, mitigate, and remediate toxic chemical releases from the derailment of its trains and to extinguish toxic chemical fires as quickly and safely as possible." (ECF No. 1-1 ¶40; *see also id.* ¶¶ 3, 8, 44, 54.) These allegations clearly are not preempted under the Third Circuit's express preemption test—§ 5125(b)(1) does not apply to Plaintiff's allegations, which are based on Defendant's *response* to the derailment. *See Tipton v. CSX Transp., Inc.*, 3:15-CV-311-TAV-CCS, at *33 (E.D. Tenn. July 7, 2016). In contrast, § 5125(b)(1) deals with classifying and packaging hazardous materials, as well as designing containers for the transportation of those materials. *See* 49 U.S.C. § 5125(b)(1). Because Plaintiff's claims do not relate to these aspects of the transportation of hazardous materials, Plaintiff's claims are not expressly preempted by § 5125(b)(1). *See Tipton*, 3:15-CV-311-TAV-CCS, at *33. Furthermore, the Court has found no authority indicating that complying with both Pennsylvania tort law and a requirement of the HMTA would not be possible or that

---

[8] Defendant makes no specific preemption arguments based on the language of the HMTA or the language of regulations enacted pursuant to the HMTA. Instead, Defendant's entire HMTA preemption analysis is based on the following sentence: "Her negligence and nuisance claim, insofar as they are premised on CSXT's transport of chemicals, are preempted by the HMTA." (ECF No. 8 at 23.)

Pennsylvania tort law "is an obstacle to accomplishing and carrying out" the HMTA, and

Defendant has not pursued this argument. *See* 49 U.S.C. § 5125(a). Therefore, the Court

declines to dismiss Plaintiff's claims based on HMTA preemption.

## B. Economic Loss Doctrine

In the instant Motion and accompanying Brief, Defendant contends that Plaintiff's

negligence and private nuisance claims should be dismissed because they are barred by

Pennsylvania's economic loss doctrine. Defendant argues that Plaintiff cannot recover in

tort because she does not allege personal injury or specific property damage that she

suffered due to the train derailment and subsequent evacuation of her home. (ECF No. 7

at 1; ECF No. 8 at 1, 4.) The Court disagrees.

In Pennsylvania,[9] "no cause of action exists for negligence that causes only economic

loss." *Aikens v. Balt. & Ohio R.R.*, 501 A.2d 277, 279 (Pa. Super. Ct. 1985); *see Spivak v. Berks

Ridge Corp. Inc.*, 586 A.2d 402, 405 (Pa. Super. Ct. 1991). "Economic loss has been defined

as 'damage for inadequate value, costs of repair and replacement of defective product,

[and] consequential loss of property, *without any claim of personal injury or damage to other

property.'" Am. Stores Props., Inc. v. Spotts, Stevens & McCoy, Inc.*, 648 F. Supp. 2d 707, 713

(E.D. Pa. 2009) (quoting *Palco Linings, Inc. v. Pavex, Inc.*, 755 F. Supp. 1269, 1276 (M.D. Pa.

1990)); *see Ricchiuti v. Home Depot, Inc.*, 412 F. Supp. 2d 456, 459-60 (E.D. Pa. 2005) (defining

---

[9] Pennsylvania substantive law governs Plaintiff's claims for negligence and private nuisance, as well as the applicability or inapplicability of the economic loss doctrine. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) ("A federal court sitting in diversity must apply state substantive law and federal procedural law.").

economic loss as "monetary losses resulting from delays caused by the tort"). In the seminal case of *Aikens v. Baltimore & Ohio Railroad*, the Superior Court of Pennsylvania articulated the logic behind this principle:

> To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.

*Aikens*, 501 A.2d at 279; *see Moore v. Pavex, Inc.*, 514 A.2d 137, 139-40 (Pa. Super. Ct. 1986) (discussing why liability cannot extend to those with solely economic losses).

The scope of the economic loss doctrine is not restricted to negligence actions; instead this doctrine extends to tort liability more generally, *Gen. Pub. Utils. v. Glass Kitchens of Lancaster, Inc.*, 542 A.2d 567, 570 (Pa. Super. Ct. 1988) ("[E]conomic losses may not be recovered in tort absent any physical injury or property damage); *see Duquesne Light v. Pa. Am. Water Co.*, 850 A.2d 701, 705 (Pa. Super. Ct. 2004) (discussing Pennsylvania's "strong, oft-stated public policy of barring recovery for economic losses sustained as a result of another's tortious conduct"), including to liability for private nuisance. *See Moore*, 514 A.2d at 139 (rejecting the contention that plaintiffs could recover under the law of private nuisance for purely economic harm); *see also Duquesne Light*, 850 A.2d at 704 (explaining that the *Moore* court found that the economic loss doctrine barred the plaintiffs' recovery for private nuisance); *In re One Meridian Plaza Fire Litig.*, 820 F. Supp. 1460, 1479 (E.D. Pa. 1993), *vacated in part on other grounds*, Civ. A. Nos. 91-2171–91-2547, 1993 WL 224167 (E.D. Pa. June 14, 1993), *and rev'd sub nom. on other grounds, Fed. Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270 (3d Cir. 1993) ("[T]he arguments underlying Pennsylvania's adoption of

the economic loss doctrine would be severely undermined if plaintiffs could circumvent the doctrine with creative pleading, such as the use of a private nuisance theory in lieu of negligence."). Therefore, the economic loss doctrine clearly applies to Plaintiff's claims of negligence and private nuisance.[10]

The issue here is therefore whether Plaintiff has plausibly pleaded non-economic losses. While Defendant argues that Plaintiff only makes conclusory allegations of "property damage," Plaintiff alleges injuries, including the cost of boarding her dog, the expiration of food, and the inability to can vegetables (ECF No. 1-1 ¶¶ 22-23, 27), that are not "economic losses" in the traditional sense—they are not damages for the costs of repair of a defective product or for lost wages as a result of tortious behavior, for example. *See, e.g., David Pflumm Paving & Excavating, Inc. v. Found. Servs. Co.,* 816 A.2d 1164, 1166 (Pa. Super. Ct. 2003) (applying the economic loss doctrine when a contractor suffered economic losses due to the defendants' representations that rock would not be encountered during an excavation job); *Aikens,* 501 A.2d at 278-79 (barring the plaintiffs' recovery of lost wages as "purely economic loss" when the defendant's negligence caused a train derailment that damaged the plaintiffs' place of employment); *Werwinski v. Ford Motor Co.,* 286 F.3d 661,

---

[10] Although Plaintiff argues that the economic loss doctrine simply means that a plaintiff cannot recover in tort on a claim that should be asserted in contract (ECF No. 22 at 6), Pennsylvania courts have not always followed Plaintiff's limited interpretation of the economic loss doctrine, and have instead applied this doctrine to bar tort claims in cases in which a potential recovery in contract is not at issue. *See, e.g., Gen. Pub. Utils.,* 542 A.2d at 568-70 (applying the economic loss doctrine to a negligence action brought by corporations associated with the tourist industry in Lancaster County, Pennsylvania, as a result of loss of business due to the Three Mile Island nuclear incident); *Margolis v. Jackson,* 543 A.2d 1238, 1240 (Pa. Super. Ct. 1988) (barring recovery based on the economic loss doctrine when a partnership sued a medical provider for negligently injuring one of its partners, allegedly causing the partnership to lose profits).

-25-

670-81 (3d Cir. 2002) (dismissing various tort claims based on the economic loss doctrine when the claims were premised on plaintiffs' purchases of defective cars from defendants).

Moreover, Plaintiff also alleges that she experienced aggravation, fear, anxiety, and an inability to use and enjoy her property as a result of Defendant's actions. (ECF No. 1-1 ¶ 49(e).) Defendant argues that courts have rejected the proposition that allegations of "emotional injury" are enough to circumvent the economic loss doctrine. (ECF No. 8 at 6.) However, the case Defendant cites in this regard, *Flannery v. Mid Penn Bank*, Civil No. 1:CV-08-0685, 2008 WL 5113437 (M.D. Pa. Dec. 3, 2008), is inapposite. In *Flannery*, the Court dismissed various tort claims based on the economic loss doctrine because the plaintiff alleged economic losses and "boiler plate allegations of 'emotional injuries.'" *Flannery*, 2008 WL 5113437, at *7. Here, to the extent Plaintiff alleges emotional injury, those allegations are not clearly boilerplate—they appear to be plausibly based on her allegations of emotional distress resulting from her evacuation from her home.

In sum, Plaintiff's alleged injuries do not clearly fall within the definition of "economic loss" discussed *supra*, and the Court therefore declines to dismiss Plaintiff's claims based on the economic loss doctrine at this stage of the case, namely, the motion to dismiss stage. The Court may revisit this issue at the time of the filing of motion(s) for summary judgment.

## C. Private Nuisance

Defendant's next contention in its Motion to Dismiss is that Plaintiff's nuisance claim should be dismissed for failure to allege sufficient facts to state a plausible claim. The Court disagrees.

Pennsylvania[11] follows the Restatement (Second) of Torts definition of private nuisance. *Karpiak v. Russo*, 676 A.2d 270, 272 (Pa. Super. Ct. 1996). According to the Restatement:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
> (a) intentional and unreasonable, or
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822 (Am. Law. Inst. 1979). When analyzing a private nuisance claim under the Restatement, "the key question is whether one person has impaired another person's private right of use or enjoyment of their land." *Diess v. Pa. Dep't of Transp.*, 935 A.2d 895, 905 (Pa. Commw. Ct. 2007).

Here, Plaintiff alleges that her private right of use and enjoyment of her land was invaded. Specifically, Plaintiff alleges that Defendant's actions caused her to have to evacuate her property. The evacuation clearly impaired Plaintiff's ability to use her land.[12] *See* Restatement (Second) of Torts § 821D (Am. Law. Inst. 1979) (explaining that "interest in use and enjoyment of land" contemplates in part "the interests that a person may have in the actual present use of land for residential, agricultural, commercial, industrial, and other

---

[11] Pennsylvania substantive law governs Plaintiff's nuisance claim. *See supra* note 9.

[12] Plaintiff also alleges that Defendant's work at the derailment site created a significant amount of bright light, noise, and fumes and odors that affected Plaintiff's ability to occupy and use her property. (ECF No. 1-1 ¶¶ 24-27, 54); *see* Restatement (Second) of Torts § 821D, cmt. b (explaining that "interest in use and enjoyment" of property "comprehends the pleasure, comfort, and enjoyment that a person normally derives from the occupancy of land"). However, as was explained *supra*, claims based on Defendant's cleanup of the derailment site are preempted by the ICCTA. Therefore, the Court cannot rely on these allegations to find an invasion of Plaintiff's private right of use and enjoyment of her land.

purposes"). Therefore, the next question is whether Plaintiff's Complaint sufficiently alleges that the invasion of Plaintiff's interest in the use and enjoyment of her property was either intentional and unreasonable or unintentional and negligent.

With regard to the intentional type of private nuisance, although Plaintiff repeatedly uses the word "willful" to describe Defendant's actions in relation to the derailment and evacuation (*see, e.g.*, ECF No. 1-1 ¶ 53), Plaintiff does not allege any facts that make it plausible that Defendant intentionally invaded Plaintiff's interest in the use and enjoyment of her property. Indeed, in Plaintiff's Memorandum in Opposition to the Motion to Dismiss, Plaintiff does not argue that Defendant intentionally interfered with Plaintiff's ability to use her property. (ECF No. 9 at 9.)

However, Plaintiff does sufficiently allege an unintentional private nuisance based on negligence, and aside from Defendant's argument that Plaintiff's negligence claim is not "otherwise actionable" because it is barred by the economic loss doctrine, Defendant does not contend that Plaintiff failed to plausibly plead Defendant's liability for negligence. (*See* ECF No. 8 at 11, 14 ("Plaintiff's claims amount at most to theories of negligence by CSXT and CSXT's employees.").)

Therefore, this Court declines to dismiss Plaintiff's private nuisance claim, as Plaintiff has sufficiently alleged that Defendant negligently interfered with her use and enjoyment of her property.

-28-

## D. Punitive Damages

Defendant's next argument is that Plaintiff's request for punitive damages should be dismissed, as Plaintiff's Complaint does not allege the outrageous conduct required to assert a claim for punitive damages. (ECF No. 7 at 1.) The Court disagrees.

Under Pennsylvania law,[13] "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (2005) (citing *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton[,] or reckless conduct." *Id.* (citing *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991)).

"[W]hen assessing the propriety of the imposition of punitive damages, '[t]he state of mind of the actor is vital.'" *Hutchison*, 870 A.2d at 770 (quoting *Feld*, 485 A.2d at 748). "[A] punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.* at 770; *see also Scott v. Burke*, No. 2:13-CV-278, 2013 WL 4648402, at *3 (W.D. Pa. Aug. 29, 2013).

---

[13] "In a diversity action [] the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). Therefore, as the alleged events underlying Plaintiff's claims occurred in Pennsylvania and this Court sits in Pennsylvania, the substantive law of the Commonwealth of Pennsylvania governs Plaintiff's request for punitive damages. *See id.*

"[T]he question of punitive damages is usually determined by the trier of fact, and the [c]ourt is to decide the issue only when no reasonable inference from the facts alleged supports a punitive award." *Wilson v. Smith*, No. 3:16-CV-34, 2016 WL 4775740, at *4 (W.D. Pa. Sept. 13, 2016) (Gibson, J.) (quoting *Anderson v. Nationwide Ins. Enter.*, 187 F. Supp. 2d 447, 460 (W.D. Pa. 2002). However, "courts do indeed dismiss claims for punitive damages in advance of trial." *Boring v. Google, Inc.*, 362 F. App'x 273, 283 (3d Cir. 2010).

Construing Plaintiff's Complaint liberally, Plaintiff has alleged facts that could support a reasonable inference that punitive damages are appropriate. Plaintiff alleges that Defendant's crew knew there was a problem with the train's braking system, but that Defendant ordered the crew to operate the train in spite of this problem. (ECF No. 1-1 ¶¶ 9-10.) The crew then operated the train using 33 hand brakes, knowing it was unsafe to do so. (*Id.* ¶ 11.) The unsafe operation of the train caused a railcar to partially derail, and, in spite of the fact that the crew knew or should have known about the partial derailment, the crew continued operating the train, dragging the derailed railcar for two miles before a larger derailment occurred near Hyndman. (*Id.* ¶¶ 13-14.) This derailment caused Plaintiff to have to evacuate from her home, as well as the other alleged injuries discussed *supra*. (*Id.* ¶¶ 20, 22-23.) Accordingly, Plaintiff has sufficiently alleged that Defendant knew the continued operation of the train was unsafe and knowingly disregarded the risk such unsafe operation posed to the inhabitants of Hyndman. Therefore, the Court will deny Defendant's Motion to Dismiss Plaintiff's punitive damages claim. However, the Court may revisit this issue at the time of the filing of motion(s) for summary judgment.

## VII. Conclusion

In sum, the Court concludes that to the extent Plaintiff's negligence and nuisance claims are based on Plaintiff's allegations regarding the unsafe order of Defendant's rail cars or the noise and fumes created by Defendant's cleanup of the derailment site, Plaintiff's claims are preempted by the ICCTA. Regarding the FRSA, the Court declines to dismiss Plaintiff's claims under the FRSA to the extent those claims are based on alleged violations of duties contained in federal regulations and internal rules created pursuant to those regulations. Finally, the Court will not dismiss Plaintiff's claims based on HMTA preemption.

With regard to Defendant's state law arguments in favor of dismissal, the Court declines at this stage of the proceedings to dismiss Plaintiff's claims based on the economic loss doctrine. The Court also finds that Plaintiff has stated a claim for nuisance under Pennsylvania law, and therefore will not dismiss Plaintiff's nuisance claim. Finally, because Plaintiff has plausibly alleged knowing and outrageous conduct on the part of Defendant that caused the derailment and subsequent evacuation, the Court will not dismiss Plaintiff's punitive damages request at this juncture.

A corresponding order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DENORA DIEHL,** *on behalf of herself* | )      **Case No. 3:18-cv-122** |
| *and all others similarly situated,* | ) |
| | ) |
|        **Plaintiff,** | )      **JUDGE KIM R. GIBSON** |
| | ) |
|       **v.** | ) |
| | ) |
| **CSX TRANSPORTATION, INC.,** | ) |
| | ) |
|       **Defendant.** | ) |

### ORDER

**NOW,** this 1st day of October, 2018, upon consideration of Defendant's Motion

to Dismiss (ECF No. 7), and for the reasons set forth in the accompanying Memorandum

Opinion, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (ECF No. 7) is

**GRANTED IN PART** and **DENIED IN PART.**

                                        **BY THE COURT**

                                        **KIM R. GIBSON**
                                        **UNITED STATES DISTRICT JUDGE**